IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (602) 339-1977, THAT IS STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS | Case No. 20-mj-163-01-AJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Galen E. Doud, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number (602) 339-1977, with International Mobile Subscriber Identity 311480561287206 ("the SUBJECT PHONE"), that is stored at premises controlled by Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon Wireless to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent with Drug Enforcement Administration ("DEA"), and have been since May 2017.  I am currently assigned to DEA's Manchester District Office.  While attending the DEA Training Academy, I received training on a multitude of topics pertaining to

drug investigations.  My primary duties as a DEA Special Agent include investigating federal crimes and violations of the Controlled Substances Act at the local, national, and international level.  I have been involved in numerous drug investigations, including multiple wiretap investigations, where I analyzed telephone toll records and subscriber information.  I have also participated in both physical and electronic surveillances, including monitoring cell phone "pings," the purchase of illegal drugs, enforcement operations including the execution of both search warrants and arrest warrants, and interviews of sources of information, confidential sources ("CSs"), drug traffickers, and drug trafficking organizations ("DTOs").  I am also a member of DEA's Special Response Team as well as DEA's Clandestine Laboratory Enforcement Team.

       3.      Prior to being employed as a DEA Special Agent, I was employed as a full time police officer with the City of Nashua, New Hampshire Police Department for approximately four and one half years.  I made several hundred arrests and initiated, conducted, and assisted in even more criminal investigations, many of which involved drug violations.  I worked as a police officer in a uniformed and plain clothed capacity, and debriefed numerous defendants and cultivated many sources of information and confidential sources pertaining to drug trafficking organizations.  I have also attended multiple trainings about drug related investigations, and relevant topics associated with drug investigations.  I have a Bachelor of Science degree in Criminal Justice from Northeastern University.

       4.      Based on my training, education, and experience, I am familiar with the manner and means commonly employed by drug traffickers and drug trafficking organizations to conduct their illegal activities, including purchasing, manufacturing, storing, and distributing controlled substances, the laundering of illegal proceeds, and the efforts of persons involved in such

activities to avoid detection by law enforcement. I am also familiar with the terminology and slang commonly employed by drug traffickers. I have observed and examined cocaine, cocaine base ("crack"), heroin, marijuana, methamphetamine, oxycodone, and fentanyl as well as other controlled substances. I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the jargon used in the drug trade.

      5.      Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities. Further, I know that individuals who distribute narcotics often utilize cellular telephones, and the text messaging capability included within their cellular telephones, as a method by which to arrange narcotics transactions. I also know that individuals involved in the distribution of controlled substances frequently talk in code, either during conversations or while utilizing the text messaging function within their cellular telephone, as a means with which to avoid detection and apprehension by law enforcement. In my training and experience, I know that it is not uncommon for individuals to keep cellular telephones on their person, particularly as cellular telephones are highly portable and contain highly personal information that people have an interest in safeguarding.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846, 841(a)(1) have been committed, are being committed, and will be committed by Heather DUBEAU, Gary SEWELL, and others. There is also probable cause to search the information described in Attachment A for the information described in Attachment B for evidence of these crimes as further described in Attachment B.

## PROBABLE CAUSE

8. Heather DUBEAU and Gary SEWELL are subjects involved in a methamphetamine conspiracy being investigated by the DEA and other law enforcement agencies. SEWELL, DUBEAU, and others, including Chad ROMBOW and Andrew HUTCHINS, were indicted by a Grand Jury sitting in the District of New Hampshire on August 17, 2020, for conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846, and 841(a)(1), in case no. 1:20-cr-78-PB. All defendants named in the indictment, including SEWELL and DUBEAU, are currently wanted.

9. The investigation revealed that DUBEAU and SEWELL were shipping packages of methamphetamine from Arizona to New Hampshire. More specifically, on May 10, 2019, law enforcement seized and subsequently searched two United Parcel Service (UPS) packages sent from Arizona destined for delivery to two different locations in New Hampshire. One package, destined for an address in Laconia, New Hampshire, contained a substance that was later analyzed at a DEA laboratory and found to consist of approximately 665.3 grams of 100% pure

4

d-methamphetamine hydrochloride. The second package, destined for an address in Lebanon, New Hampshire, contained a substance that was later analyzed at a DEA laboratory and found to consist of approximately 336.2 grams of 100% pure d-methamphetamine hydrochloride. Since these seizures on May 10, 2019, this investigation has revealed DUBEAU and SEWELL have continued to attempt to solicit money from New Hampshire based methamphetamine customers in exchange for methamphetamine.

10. Before moving to Arizona, DUBEAU and SEWELL lived in New Hampshire. The investigation revealed that both DUBEAU and SEWELL remain in contact with co-conspirators in New Hampshire. For example, from April 2, 2020 to May 17, 2020, there were 3 contacts between the SUBJECT PHONE and (603) 304-9059 (the 9059 phone). This investigation revealed the 9059 phone is subscribed to by Chad ROMBOW, in Grafton, New Hampshire. ROMBOW was indicted in the same conspiracy with DUBEAU and SEWELL on August 17, 2020. On May, 27, 2020, law enforcement seized ROMBOW's phone following his arrest in Hartford, Vermont, and subsequently obtained a warrant to search ROMBOW's cell phone. This search warrant revealed ROMBOW had Facebook messenger communications with DUBEAU under the name "Heather Ann." For example, on May 17, 2020, at approximately 12:47 a.m., DUBEAU messaged ROMBOW, "6023391977." On May 17, 2020, at approximately 2:29 a.m., DUBEAU messaged ROMBOW, "I signaled you." Investigators believe this communication was sent to mean a message was sent via the encrypted application Signal. Investigators have determined that use of encrypted applications such as Signal and Telegram (as outlined below) have been prevalent among DUBEAU, SEWELL, ROMBOW, and others involved in this methamphetamine conspiracy as a means to avoid detection from law

enforcement by attempting to limit their use of more conventional means of communication via telephone calls and text messages.

11. Additionally, from March 19, 2020 to April 19, 2020, there were 12 contacts between the SUBJECT PHONE and (603) 520-6425 (the 6425 phone). This investigation revealed the 6425 phone is subscribed to Jared STOTTLAR, in Tilton, New Hampshire. STOTTLAR was arrested in New Hampshire on a federal warrant for possession with intent to distribute methamphetamine in June 2020 and provided a post arrest statement regarding his knowledge of and involvement with SEWELL and DUBEAU's methamphetamine distribution from Arizona to New Hampshire.

12. On April 2, 2020, an administrative subpoena was issued to Verizon Wireless for subscriber, call detail records, and other phones associated with the account for the SUBJECT PHONE from February 1, 2020 through April 1, 2020. According to Verizon Wireless records, the SUBJECT PHONE is subscribed to by Heather DUBEAU, 1720 E. Broadway Rd., Tempe, AZ. Verizon Wireless provided the activation date of March 11, 2020. Also, an additional phone number, (480) 435-6845 was identified with this same account number.

13. On May 12, 2020, investigators met with a DEA confidential source (CS) at a predetermined location in Massachusetts. This CS was cooperating in hopes of potential consideration for pending drug charges. Information provided by this CS was able to be independently corroborated by investigators. As of June 2020, this CS is no longer a CS due to participating in the purchase and sales of drugs without being directed to do so by law enforcement.

14. This CS had previously identified SEWELL and DUBEAUs' involvement in distributing methamphetamine. On May 12, 2020, the CS identified DUBEAU's phone number

as the SUBJECT PHONE and showed investigators DUBEAU's Telegram application account profile which showed a photograph of a female investigators recognized to be DUBEAU, and listed the SUBJECT PHONE's number.  At approximately 4:51 p.m., an attempt was made to call DUBEAU via Telegram, however there was no answer.  The CS also showed investigators messages from DUBEAU's Telegram account.  Included in these messages was one dated May 12, 2020, at approximately 2:24 a.m., "Hey do you mind sending the percussion drum. ? And the best lock?if I got a box for you to just fill and I scheduled a pickup would you mind doing that at all?Gary was wondering about the drum and I needed the deadboltlock as well as a few other odds and ends."  The CS explained DUBEAU was asking the CS to send DUBEAU and SEWELL some of their property to Arizona.

    15.    On May 15, 2020, investigators again met with this CS at a predetermined location in Massachusetts.   At approximately 4:51 p.m., the CS attempted to call DUBEAU via Telegram / the SUBJECT PHONE, however, there was no answer.  At approximately 5:32 p.m., the CS attempted another call to DUBEAU via Telegram / the SUBJECT PHONE, however there was no answer.

    16.    In August of 2020 investigators learned that one of DUBEAU's brothers had passed away, and that a funeral was scheduled for August 12, 2020 at Ricker Funeral Home in Lebanon, New Hampshire.  On this date, investigators observed a female believed to be DUBEAU, matching DUBEAU's physical descriptors, arrive at the funeral home with Edward STONE, known to investigators to be DUBEAU's ex-husband, in a vehicle registered to STONE.  Investigators followed this female as she departed the funeral home in another vehicle and proceeded to an address in Lebanon known to be where STONE lives with DUBEAU's juvenile daughter.  Investigators observed an individual believed to be DUBEAU's juvenile

daughter get into this vehicle before it proceeded to DUBEAU's mother's house in Plainfield, New Hampshire.

17. Verizon Wireless records indicate that the SUBJECT PHONE is active as of August 25, 2020, and remains in contact with multiple New Hampshire based (area code) telephone numbers, some of whose subscribers have been identified, and additional numbers whose subscribers have not yet been identified. At least one of the identified subscribers is the target of a methamphetamine distribution investigation that I am involved in. DUBEAU and SEWELL's whereabouts are currently unknown.

18. Cell-site location information for the time period from August 1, 2020 to September 1, 2020 is likely to assist investigators identify additional evidence of this methamphetamine conspiracy. For example, location information from the SUBJECT PHONE could help investigators identify the locations of co-conspirators, drug and/or money "stash" locations, and drug customers. It should be noted none of the other co-conspirators currently charged in this conspiracy have been arrested yet. Although DUBEAU was believed to be seen by investigators at a funeral, while in New Hampshire, it is reasonably foreseeable DUBEAU and/or SEWELL would have taken the opportunity to conduct drug related in person business and meetings with other co-conspirators both identified and not yet identified by law enforcement. As such, location information from the SUBJECT PHONE will provide additional evidence of this charged methamphetamine conspiracy.

19. In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service,

including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

20. Based on my training and experience, I know that Verizon Wireless can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as Verizon Wireless typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

21. Based on my training and experience, I know that Verizon also collects per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

22. Based on my training and experience, I know that wireless providers such as Verizon Wireless typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account

number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Verizon Wireless typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

23. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

24. I further request that the Court direct Verizon Wireless to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Verizon Wireless, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

/s/ Galen Doud
Galen Doud
Special Agent
DEA

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the contents of this affidavit and application.

Date: **Sep 4, 2020**

Time: **11:49 AM, Sep 4, 2020**

Andrea K. Johnstone
U.S. Magistrate Judge

10

# ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number (602) 339-1977, with International Mobile Subscriber Identity 311480561287206 ("the SUBJECT PHONE"), that is stored at premises controlled by Verizon Wireless ("the Provider"), headquartered at 180 Washington Valley Road, Bedminster, New Jersey. This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A).

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period August 1, 2020 to September 1, 2020.

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

      viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

      i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

      ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as per-call measurement data (also known as the "real-time tool" or "RTT" data).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 846, 841(a)(1) involving Heather DUBEAU and Gary SEWELL during the period August 1, 2020 and September 1, 2020.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.